# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **MARSHALL D. SUTHRLEN** | **CIVIL ACTION NO. 07-0644** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **DIAMOND OFFSHORE CO INC., ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## OPINION

Plaintiff Marshall D. Suthrlen ("Suthrlen") brought this action under the Jones Act, 46 U.S.C. § 688, and general maritime law against his employer, Diamond Offshore Management Company ("Diamond Management"), and the owner of the vessel to which he was assigned, Diamond Offshore Services Company ("Diamond Services") (collectively "Diamond").[1]

A bench trial was held in this matter on May 6, 2008.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court hereby enters the following findings of fact and conclusions of law.  To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

---

[1]Defendant was improperly named as Diamond Offshore Co., Inc., but there is no such entity.  The Court will refer to these two affiliated corporations as "Diamond" for ease of reference.

**A.      FINDINGS OF FACT**

**1.      Background**

Suthrlen brought this action under the Jones Act and general maritime law as a result of neck injuries that he sustained on October 2, 2006,  while working as a roustabout for Defendant Diamond Management, aboard the *Ocean Valiant*, a Mobile Offshore Drilling Unit ("MODU") owned by Co-Defendant Diamond Services.

At the time of the accident, Suthrlen was thirty-seven years old.

Suthrlen, who is now thirty-nine years old, is a resident of Columbia, Louisiana.  He is married to Heather Suthrlen and has two sons, ages two and four.  Suthrlen completed the eleventh grade and does not have a G.E.D.  Between 1997 and his employment with Diamond Management, Suthrlen held approximately sixteen jobs.  Among other positions, Suthrlen has worked as a fertilizer truck driver, a technician performing oil changes and brake repair, a sign repairer, a dispatcher in an insulation plant, a dispatcher in a plastics plant, a warehouse manager for an oil and supply company, an over-the-road truck driver, an employee of a hardware store, and he and his wife had their own insulation business.

**2.      Diamond Pre-Employment Procedures**

In November 2005, Suthrlen interviewed with Diamond in Houston.  He was contacted in January 2006 and asked to undergo a pre-employment physical examination.

On March 13, 2006, Suthrlen was examined at Westbank Industrial Medicine, Gretna, Louisiana.  [Exhibit 3].  As part of his pre-employment physical, Suthrlen had x-rays and an MRI taken of his spine.  The tests revealed annular disc fissure and disc protrusion at the L4-5, but were otherwise normal.  Dr. Brian Bourgeois determined that Suthrlen met the physical

requirements of the roustabout position.

### 4.    Suthrlen's Roustabout Training

After Diamond Management hired Suthrlen, he attended a one-week school in Morgan

City, Louisiana, on the *Mr. Charlie*.  Suthrlen was assigned first as a roustabout to the *Ocean*

*Nugget* and then to the *Ocean Baroness*.

### 5.    Assignment to the *Ocean Valiant*

In July 2006, Suthrlen was assigned to the *Ocean Valiant*.  Suthrlen was one of

approximately fifty (50) crew members.  Suthrlen continued to work as a Roustabout II, the most

entry level position on the vessel.  He was paid $13.78 an hour plus travel pay of $150.00 per

month.  Suthrlen worked a fourteen-day hitch.  During his hitch, he worked 84 hours per week.

The *Ocean Valiant* is a semi-submersible drilling rig with dimensions of approximately

118 meters length by 68 meters breadth by 43 meters depth.  The *Ocean Valiant* was built in

South Korea in 1988 by Hyundai Heavy Industries.  [Exhibit 105].  It is flagged and registered in

the Republic of the Marshall Islands.  [Exhibit 106].

At the time of the accident, the *Ocean Valiant* was located in the Gulf of Mexico on the

Outer Continental Shelf off the coast of Louisiana and was drilling an oil well for Anadarko Oil

and Gas.  The *Ocean Valiant* had a current Certificate of Compliance from the Coast Guard.

[Exhibit 104].

### 6.    October 2, 2006 Accident

On October 2, 2006, Suthrlen was cleaning the main deck.  He and another roustabout,

Jonathan Beaulieu ("Beaulieu"), found some tools on deck and went to return them to the motor

room one deck below.[2]  Suthrlen and Beaulieu descended one interior stairwell to the motor room.

After returning the tools, at approximately 6:30 P.M., Suthrlen and Beaulieu began ascending a second interior stairwell to the main deck.  The stairwell consisted of steps with a handrail on each side.  Above the stairwell is an overhead beam or I-beam.  The I-beam is an integral structural element to the rig that supports the main deck.  The stairwell walls, ceiling, and the beam were all painted white.  There was no sign cautioning "low head room," no cushioning material on the beam, and no yellow and black paint on the beam, all of which are common in the industry to prevent injuries.

Beaulieu and Suthrlen are both six feet, two inches tall.  Beaulieu ascended the stairwell without incident.  About mid-way up the stairs, Suthrlen hit the top of his hard hat on the I-beam above the stairs.  At the time of his injury, Suthrlen was wearing a hard had and work boots, which added approximately two-four inches to his height.[3]  The impact on Suthrlen's hard hat pushed his head down towards his neck, resulting in his neck injury.

Suthrlen then went up to the main deck to tell his supervisor, crane operator Chad Broussard ("Broussard").  Broussard observed Suthrlen walking stiffly towards him.  After Suthrlen told him about the incident, Broussard instructed Suthrlen to find and speak with Gary

---

[2]Beaulieu testified that he and Suthrlen were getting some oil from the motor room, but Suthrlen testified that Beaulieu was incorrect.  The Court finds Suthrlen's testimony credible on this issue.

[3]Dennis Sharp, the offshore installation manager for Diamond, testified that the hard hat and shoes added two inches; Suthrlen testified that they added three inches, and Suthrlen's expert, Geoff Webster, testified that they added four inches.  Although the Court received no definitive answer, it need not resolve this issue for purposes of this Opinion.

Pierson ("Pierson"), the Safety Department representative.

Pierson, who had worked as a paramedic, examined Surthlen and gave him a heating pad, Benalog cream or ointment, and ibuprofen.   Pierson also had Suthrlen fill out a handwritten report.  Suthrlen stated: "I was going upstairs from motor room and jammed my head on an I-beam above stairs.  Felt and heard three or four pops in my neck.  It stunned me and I stood there a while before I told Chad [Broussard]."[4]

Pierson contacted Dennis Sharp ("Sharp"), the offshore installation manager ("OIM"), who oversees the operations and safety of the rig, to investigate the incident.  Sharp found the stairwell to be clean and well lit and found no obstruction or projection that caused the accident.  Sharp also looked at the stairwell and took some measurements after the accident.  The measurement from the I-beam to the step is 78 ¾″.  Sharp signed the incident report.

Neither Sharp, Broussard, Pierson, nor another supervisor, Roy Douglas Pruett, are aware of any persons hitting their head on the beam before.[5]  Suthrlen had also ascended the stairs 20 times before without incident.[6]  Diamond's expert, Naval Architect Arthur Sargent, who is six

---

[4][Exhibit 1, p. 3].

[5]Sharp had been assigned to the *Ocean Valiant* for four years; Broussard had been assigned to the vessel for eight years; Pierson had been assigned to the vessel for two years; and Pruett had been assigned to the vessel for four years.

[6]The Court does not find credible the deposition testimony of Beaulieu that he struck his head on the I-beam several times.  Beaulieu has since been terminated by Diamond and has filed his own lawsuit against the company.

The Court also has not considered Beaulieu's testimony that Broussard and other unidentified "supervisors" were aware of "people . . . hitting their head" on the I-beam prior to Suthrlen's accident because it was commonly joked about by unidentified employees.  Beaulieu's testimony is based on inadmissible speculation and hearsay.  See Fed. R. Evid. 801; see also Fed. R. Civ. P. 56(e) ( "affidavits shall be made on personal knowledge, shall set forth such facts as

5

feet, one and one-half inches tall, walked up the stairs numerous times while wearing a hard hat and steel-toed boots, but was unable to recreate the accident.[7]  He also physically examined the stairway and beam and found no problems.

The *Ocean Valiant* is Coast Guard-certified, but the Coast Guard does not have any regulations which apply to the vertical clearance required in stairwells.  The Coast Guard applies the American Society for Testing and Materials ("ASTM") standards for shipbuilding.  At the time that the *Ocean Valiant* was built, there was no recommended clearance for steps provided by the ASTM.  Shortly after the rig was built, the ASTM standard was published, suggesting a minimum clearance of 76″ and with a recommended clearance of 78″.  In 1995, the standard was changed to a minimum of 78″ and a recommendation of 80.″  This standard remained unchanged at the time of Suthrlen's accident in 2006.  See ASTM F1166 [Exhibit 111].

The *Ocean Valiant* is not required to comply with any other guidelines for vertical clearance in vessel stairwells, such as the American National Standards Institute ("ANSI") or the American Bureau of Shipping ("ABS").   ABS and ANSI recommend a vertical clearance of 84″.

The *Ocean Valiant*'s clearance of 78 ¾″ was within the standards of the ASTM, but below that of the ABS and ANSI.  ABS representatives inspected and passed the *Ocean Valiant* prior to Suthrlen's accident. [Exhibit 105].  Inspectors for the Marshall Islands had also inspected and passed the *Ocean Valiant.*

_____

would be admissible in evidence . . .").

[7]The Court finds the testimony of Diamond's expert, who physically inspected the stairwell, more credible than that of Suthrlen's expert, who did not.

### 7.   Medical Treatment

On the morning following the accident, Suthrlen was unable to work.  Although he remained on the *Ocean Valiant* for the remainder of his "hitch," Suthrlen did not perform his normal roustabout duties, so he performed fire watch and other light duties.  During his fourteen days off, Suthrlen was in pain, but did not seek medical treatment.  He returned to work his next fourteen-day hitch on the *Ocean Valiant* and did some "sling" (light duty) work, but was taken off the job because of his neck pain.  He treated his pain with ibuprofen.

When he returned home, on November 21, 2006,  Suthrlen sought treatment from his family doctor.  Subsequently, he has received further treatment from a specialist and has never returned to work for Diamond.

### B.   CONCLUSIONS OF LAW

Suthrlen has asserted claims of negligence under the Jones Act and breach of the warranty of seaworthiness under General Maritime Law.[8]  Diamond has raised the defense of comparative negligence.

### 1.   Jurisdiction

The Court has jurisdiction pursuant to the Jones Act, 46 U.S.C. § 688, and under 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims.  Suthrlen designated this action as an Admiralty or Maritime claim within the meaning of Rule 9(H) of the Federal Rules of Civil Procedure.

---

[8]Since the time of Suthrlen's accident, Diamond Management has paid for his medical bills and has paid maintenance and cure. [Exhibit 112].  However, Suthrlen has not been paid for travel expense in the amount of $349.00.

2.      **Negligence**

As a threshhold matter, all parties agree that Suthrlen was a seaman entitled to the

protection of the Jones Act, and the *Ocean Valiant* was a vessel in navigation.   See Chandris, Inc.

v. Latsis, 515 U.S. 347, 368 (1995) (To determine if an individual worker is a seaman, and

therefore entitled to the protections of the Jones Act, "an employee's duties must contribute to the

function of the vessel or to the accomplishment of its mission," and the employee "must have a

connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial

in terms of both duration and nature.").

The Jones Act provides a cause of action in negligence for a seaman injured in the course

of his employment against his maritime employer.   A seaman is entitled to recover under the

Jones Act "if his employer's negligence is the cause, in whole or in part, of his injury." Gautreaux

v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir.1997) (en banc).  The employer is held to a

standard of ordinary prudence under the circumstances.  See id. at 336 (explaining that the

circumstances include the employee's reliance on his employer to provide a safe working

environment).  However, a Jones Act employer is not required to protect its employees from all

types of injuries in the absence of a showing of negligence.  See Gavagan v. United States, 955

F.2d 1016, 1019-21 (5th Cir. 1992).

Here, Suthrlen failed to prove that Diamond was negligent.  The *Ocean Valiant* was in

compliance with applicable Coast Guard regulations and was Coast-Guard certified.

There were no vertical clearance requirements with which Diamond failed to comply.

Although the ANSI and the ABS have vertical clearance standards, these standards have not been

incorporated into Coast Guard regulations and thus do not render Diamond negligent *per se*.  See

generally Melerine v. Avondale Shipyards, Inc., 659 F.2d 706, 713 (5th Cir. 1981).  Rather, the

standards may be considered as evidence of Diamond's negligence.  Id.  In this case, however, the

*Ocean Valiant*'s clearance of 78 ¾″ complied with the ATSM standard for shipbuilding.  While

the clearance was below the recommendation of ABS, ABS representatives had surveyed and

passed the *Ocean Valiant* prior to Suthrlen's accident, even with this lower clearance.  The

Marshall Islands had also inspected and passed the *Ocean Valiant.*

        Moreover, there was no credible evidence that Diamond was aware of any persons hitting

their head on the beam in the eighteen (18) years since the rig was built or any other evidence that

did or should have placed Diamond on notice that the I-beam created an unsafe condition for

workers.

        Under these circumstances, the Court cannot conclude that a reasonably prudent person

would have taken steps to increase the clearance or mark or cushion the beam.  The Court finds

that Suthrlen has failed to show by a preponderance of the evidence that Diamond was negligent.

        **3.      Unseaworthiness under General Maritime Law**

        General maritime law imposes a duty upon shipowners to provide a seaworthy vessel.

 Carlisle Packing Co. v. Sandanger, 259 U.S. 255 (1922).  Therefore, a Jones Act seaman "may

also sue the owner of any vessel on which he is working for a breach of the warranty of

seaworthiness."   Becker v. Tidewater, Inc., 335 F.3d 376, 387 (5th Cir. 2003).  The seaman must

prove, by a preponderance of the evidence, "that the owner has failed to provide a vessel,

including her equipment and crew, which is reasonably fit and safe for the purposes for which it

was intended to be used."   Boudreaux v. United States of America, 280 F.3d 461, 468 (5th Cir.

2002) (quoting Jackson v. OMI Corp., 245 F.3d 525, 527 (5th Cir.2001)).

In addition, a seaman "must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." Jackson, 245 F.3d at 527.  An unseaworthy condition is the legal cause of an injury if it "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Brister v. A.W.I., Inc., 946 F.2d 350, 355 (5th Cir. 1991).

Diamond Services is not liable in this case because Suthrlen has failed to establish that it breached a duty to provide a safe vessel.  The rig had been properly inspected by the Coast Guard, was in compliance with all Coast Guard regulations, had been inspected and passed by the Marshall Islands and the ABS, and, although not required to do so, complied with the vertical clearance set forth by the ATSM.

Although the I-beam was not painted a different color, did not have a warning sign, and was not cushioned, there was no need for Diamond Services to take these actions.  There was sufficient clearance between the step and the overhang to permit persons to ascend the steps without injury.  Indeed, Suthrlen had done so, in his own words, twenty times before.  While there are additional steps Diamond Services could have taken to make the I-beam more noticeable, it was not required to do so when Suthrlen had been provided with a safe workplace.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Diamond and against Suthrlen.

MONROE, LOUISIANA, this 20th day of June, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

10